We have four cases to hear argument in this morning, beginning with Colabo Innovations against Sony 18-1311. Good morning. May it please the court. My name is Dan Oleko. I represent Colabo Innovations in this appeal. We seek reversal of the board's decision on three different grounds or alternatively vacater. The three grounds for reversal are the board's construction of adhesive, conflicting with the intrinsic evidence and placing undue weight on the extrinsic evidence, the board's construction of wider area, which is nonsensical and also inconsistent with the intrinsic evidence. How many of the claims are affected by the wider area issue? I believe all of them, Your Honor. Even though that term doesn't appear in very many of them? I believe the alternative is larger area, at least with respect to Claim 7. It wouldn't affect terms that didn't use either larger area or claims that didn't use larger area or wider area. The board's findings that Yoshino discloses the wider area limitation and that Takashi renders that limitation obvious are also not supported by substantial evidence and we request reversal on that basis as well. And finally, we think the board's decision should be vacated because the board failed to provide an adequate explanation of its obviousness basis and also the retroactive application of IPR to the 714 patent is unconstitutional because the 714 patent issued before the AIA. Good thing you have 10 minutes to cover all that stuff. Well, I'm going to just highlight the more important issues, most important issues. With respect to the construction of adhesive, we believe the board erred by placing undue weight on the extrinsic evidence. The board based its construction on the dictionary. What about the fact that admittedly your specification does talk about gluing, you've got your preferred embodiment and maybe even every embodiment refers to gluing, but the plain claim language is broader than that and talks about adhesive. Why should we construe the claim term by reading in an embodiment from the specification? Well, it's not reading in an embodiment, in fact, all the embodiments of the claims use glue. The description... But if you wanted to use the word glue in the claim, you would have used the word glue. But the claim should be interpreted in light of the disclosures in the specification, not just based on the claim language. So I agree with you. There's that line. Like when are you reading something in from the specification into the claims and when are you reading the claims in light of the specification? You know, there's a distinction there. So why, particularly in this case, do you think it's relevant that because every embodiment talks about glue, we're supposed to say adhesive should be limited to glue? Well, it should be... We're proposing construction of gluing with an adhesive. So to clarify, we're not saying the only adhesive that could be used is glue generically. We're saying that you need to be gluing the chip to the package, which would exclude an injection molding process. The patentee focused on two different aspects of the invention to distinguish it over the prior art. First, the lack of the use of a bonding technique to attach the chip to the package. And second, the use of the glue on the sides of the chip using a press fit jig to hold the chip in place while it could be positioned at the same time. If you weren't using a glue in that manner on the sides of the chip, the invention wouldn't be accomplishing its intended purpose. It does sound like you're saying gluing with a glue as opposed to any adhesive, because you could have an adhesive, I guess you'll agree, that isn't a glue. Absolutely. Double-sided tape, for example. You wouldn't regard that as a form of glue, right? No. But it would be an adhesive? I believe tape would be potentially an adhesive in the broadest sense of the term. Right. And therefore, you would say that that would fit within the scope of the claims? I don't believe using tape would fit within the scope of the claims. But you said it was an adhesive, and you said gluing with an adhesive isn't using glue, and that's within the scope of the claim. So why isn't my example within the scope of the claims as you've defined it? The specification doesn't talk about using anything else except for a type of glue or similar adhesive. Right. So you're really saying it is gluing with glue? Something analogous to glue, I think, would also work. I think the problem... Do you have an example of what would be analogous to glue, and that would be gluing? In this context, the specification doesn't disclose any other alternatives to glue. It talks about using resin, but only as a mold for the package itself. And in this case, resin could be potentially used as a glue in some context, but not to glue this component to the package in an injection molding technique. But I guess the real problem with the board's construction is that it allows any material to be used as an adhesive, whereas we believe it should be only those materials that would be normally used that could be capable of gluing the package or the sides of the chip to the package. And it shouldn't be a material that interferes with the purpose of the patent, which is to provide a precise way of attaching the chip to the package. So here, the board started with a general dictionary definition of adhesive, and then looked to the claims only to see if the claims conflicted with that general purpose definition. And that's exactly the type of analysis that was rejected by Phillips, the Texas Digital Methodology. But here, the specification, as I noted, distinguishes the invention from different types of mounting techniques such as dye bonding, which would attach the chip to the package without glue, but does so in a way that doesn't allow the invention to accomplish its intended purpose. It also distinguished the use of adhesive on the sides of the chip from the molded resin that's used to create the package itself. And importantly, the patentee distinguished the very prior art that the board found and validated the claims during prosecution. The patentee distinguished Takashi on the basis that he used this bonding technique. Can I go back for a minute? You made the point, you said that the board had looked at the dictionary first, and then looked at other evidence. But when I look at the board's opinion, for example, at JA-17, the last thing they refer to in their analysis is the dictionary. It says, you know, this construction is also supported by the dictionary reference. So how is it, what am I missing so that I can understand your point? At the beginning of the analysis, the board says the plain Norgay meaning of adhesive is to adhere. And the only way, the only support for that definition or that construction is the dictionary definition itself, which says adhesive means tending to adhere. Well, isn't there also like some expert testimony and additionally? Actually, there's not with respect to Sony's expert. Sony's expert didn't opine at all on this construction. And Colabo's expert said an adhesive doesn't include injection molding. So there's no expert testimony based on the dictionary definitions. The dictionary was introduced by the court, I believe, in the initial decision instituted in the IPR. Can I ask you a question on a different topic? Sure. And this would, I guess, be the wider area topic and not a claim construction, but very specifically about Yoshino. Yes. So I'm looking at the Yoshino picture that everybody uses. It's, I guess, in fairly large format on page 26 of your brief. And the green shape, except for the little bit at the bottom, is, I think of it as an anvil shape. Can you tell me anything about whether the functioning of the CCD is affected in some positive or negative way when, above the CCD, the opening goes straight up, as in Takashi, or whether it takes this anvil shape of going straight up a little bit and then widens? Is that, do we know anything about whether that complicates the working of the CCD, improves it, because presumably maybe some light is coming in at a greater angle or something? I believe that was the intended purpose. The openings in Yoshino, the improvement sought by Yoshino was based upon that upper opening of the anvil shape. And Yoshino said, we're having this open, tapered anvil shape to improve the functioning of the chip. But it did not talk about the opening below the chip as needing to be wider than that upper opening. Did you make an argument to the board? So one of the things I guess I'm focused on a little bit, and maybe you can help me out, is I think I understand why the opening at the bottom where the chip is being inserted needs to be wider than the rim that it sits against. I'm not sure I understand, and therefore wider than the piece of the green here that's immediately adjacent to the rim. I'm not sure why it needs to be wider than the top of the anvil. Did you make arguments to the board about how it's important to focus on the top of the anvil and not just the part of the anvil that is immediately north of the sensor? I don't believe so. I think we focused on the area that's immediately north of the sensor, because the reason for the wider bottom area is so that the chip locks into the package tightly without any airspace around it. So it doesn't, it's not a, we're talking about just the area of the opening. So if you're looking at, we're looking at that narrowest part of the opening for the top part, for the top of the chip, the top of the package. And the, there's no taper on the bottom, but just the area of the opening on the bottom. So we think those are the most important pieces, not the area on the top of the chip. Where does your specification talk about the importance of the bottom opening being wider than the top opening? It doesn't talk specifically about it being important, but it says that the bottom opening should be wider so that it can tightly fit into the package. And that is... Is there any reason though why the top opening has to be smaller than the bottom opening? I mean, I understand the bottom opening has to be sufficiently large to allow the chip to be inserted, but why does the top have to be smaller? Well, if they were the same size, the chip would just slide through the opening, right? So, and if the top was larger than the bottom, I guess, I can't really understand how necessarily that would work, but if there were this, it needs to be wider at the bottom so the chip fits into this little concave or, you know, this little hole or area. Correct me if this is wrong, but my understanding was that, as you say, the chip comes in from the bottom and it needs so that the area needs to be larger or wider or whatever. But at the top, it needs to have some place that you can attach the chip. And so the opening is smaller so that you attach around the periphery of the chip. Isn't that right? That's right. That's right. Yeah. That's where the leads are connected to the pads, right at the edge of the hole. So the hole at the top has to be smaller than the hole at the bottom. Yes. Yes. Yeah. You are well into your rebuttal time. And do you want to continue or you can... I will reserve the rest of my time for rebuttal. Thank you. Thank you. Thank you, Your Honor. It's Matthew Smith. Would you mind starting with the anvil? Yes. And what specifically about the anvil would you like me to address? So, if you're looking at the anvil, and maybe Mr. Boleszko answered this question already. As I read your expert in particular, he was sort of focused on the top of the anvil and not, let's call it, the bottom of the green piece that sits on top of the yellow. Are we looking at the same thing? I'm not looking at the colored version, unfortunately. Oh, yeah. That was actually a little bit of a problem in one of the briefs, but... I see. Thank you. Above the CCD, right? The image sensor, I guess, is the yellow and then the green opening, which is anvil-shaped. And for reasons I think we just discussed, the bottom portion of that anvil sitting on the top of the image sensor almost certainly needs to be smaller than the space that you're below it where you're inserting. I don't understand why the top of this anvil needs to be smaller than the space into which you're inserting the image sensor from the bottom. The very top of the anvil? Yes. I'm not sure I have an answer to that question either, Your Honor, why that needs to be... Yeah, but the glass sits right on the top of the anvil, and I think that the language that your expert used, and I think your petition as well, describes that being the top of the package. Mm-hmm. Top of the glass, certainly. Well, the blue part of the package. And if one therefore focused on the top of the anvil, it's not apparent to me that you can infer anything except from the happenstance of this particular drawing that that top is somewhere, which is the opening into which the CCD is inserted from below. And if your argument therefore depended on that, wouldn't we be making more of a drawing than in the patent world we're allowed to make? I'm not sure the argument does depend on that, Your Honor, and it's because the relevant opening is at the bottom, I believe, at the bottom of the anvil. What tells us that that's the relevant opening? Well, the claim language, just going back to... Claim language of the 714. The 714 patent, right, Your Honor. There is a package having a through-hole therein, openings on both end faces thereof, and different opening areas of said openings. And it's just a question of what the opening is at that point in time. Right, but if the blue part of that picture goes all the way up to the top of the anvil, and that's part of the package, which I think the labeling is, then that suggests that we need to look at the horizontal measurement at the top of the anvil. I see the difference in the way we're thinking about this. I think the opening can have a third dimension to it.  And the relevant part, and I think certainly from the specification of the 714 patent and what it's trying to do, as the colloquy in my counterpart's presentation drew out, the opening of the package body above the CCD needs to be a little bit smaller because the leads have to be underneath the package body, right? And as long as you can have some depth to that opening, then the narrowest part of the opening fulfills that function. And I think that's the relevant part of it for the 714 patent. I think if you strictly say that the opening is a flat surface, then we can get into these kinds of arguments about the anvil being wider at the top or wider at the bottom, although it does appear to be narrower from figure one. In the picture. In the picture, it does. But I think that's a dangerous thing to do in patent report. But I think, as I said, from the function of the 714 patent, the opening where it is immediately above the CCD needs to be narrower because otherwise the leads coming into the package are not going to have any space for the pads on the chip to connect to them from underneath. So there needs to be some overhang there. This is also, I think, not an argument that was made below, so you're not going to have board findings. When you're looking, at least, and this is an optical device, so in optics, when you're looking at the aperture of a lens or any optical device, you would look at typically the narrowest point at which there is clear passage of light, would you not? That would be the part that would restrict the light, correct? The package body here is not transparent, as I understand it, and so it is having the effect of blocking light on the side from hitting circuits you're not supposed to hit. Circuits aren't photo dials that might cause the effect of light. So if that's the right way to look at this, then actually, if you think of this opening as the aperture of the device, then the aperture, at least in the optical art, would seem to me to be not the width of the green space below the bottom of the anvil, but right at the point at which the anvil comes to a point just above the lead. Would that not be the opening that's pertinent here? You see what I'm talking about? In other words, you could actually think of this green space as having three different dimensions. One, the dimension at the very top underneath the glass. Two, the dimension at the very bottom just above the chip. And three, the area where the package comes to its smallest dimension. I think that's correct, Judge Bryson, and if you look at it in plan view, turn it around from the figure, look at the light that would project through, what you would see is the smallest opening at the bottom. Now it's true that the very bottom is not, I guess, part of the blue package, but still, the bottom of the blue package is the place where the aperture is the smallest, right? Yes, that is correct. I do just want to mention that, of course, we'll be splitting time with the government. The government intervened on constitutional issues, so the government's attorney will address those. I do want to talk quickly about the secured via an adhesive limitation, because it's not particularly clear what the relevant construction is. I don't think it's an issue about adhesive versus glue. I think the real issue is about secured via an adhesive, which in the device claims, I think is a structural limitation versus a process limitation. In other words, Colabo's intent in construing secured via an adhesive as gluing was to introduce a process limitation into the claims, which makes less sense in the device claims, and change that process limitation into a negative process limitation, which would exclude injection molding. I think the board was correct to reject that sort of tortuous construction for a number of reasons. Certainly, in the device claims, it's awkward to read in a process limitation, and particularly a negative one. The board, I think, was correct, and let me address the question of reading in embodiments and whether this is all embodiments or not. I don't actually think it is all embodiments. In column two of the 714 patent, in the disclosure of the invention, there are actually a recitation of a number of embodiments that don't even talk about securing via an adhesive, which seems to indicate that the other steps of the processes or the other parts of the package where we're talking about the wider or smaller opening areas were just the more important ones, and adding secured via an adhesive was maybe an embodiment that was intended to be originally in a dependent claim or something like that. But when you take that a step farther and say what gluing actually means, what's really important in this construction is that gluing excludes the process of applying the adhesive or applying the glue, there's really no support at all for that in the specification. What Dr. Aframovitz originally said was that because the package body, which in Yoshino would be that blue part you were referring to, which is something separate than the back part of the chip where the adhesive would be applied, is made by injection molding, that means that another part of the chip cannot be made by injection molding, presumably because had the inventors wanted to say that, they would have said that. But there's just no case law support, I think, for saying that because a technique is mentioned in the specification with respect to one component, it is therefore excluded for all other components that don't mention that technique in the specification. And you also have, I think, the issue that the 714 patent itself applies the adhesive by injection. If you read the detailed embodiments that are related to the cross-sectional figures, when it talks about applying the adhesive, it's saying it's injecting the adhesive. And I think that's important because one of Dr. Aframovitz's reasons for saying injection molding would be excluded from the scope of the claims here is that the force of the injection could disturb some of the electrical bonds, particularly if they were wire bonds, that the force of the glue or the adhesive coming in could move some of those wires in a detrimental way. But the 714 patent is injecting that adhesive as well. So now you'd be getting into things like, what is the force of the injection? There's just no record on that anywhere. The... I think you've gone over your time. Do you have anything else? I do have one quick question for you, if you happen to know. Either the Fuji or Onishi references that played bit roles here, were they, like Takashi, considered during the original prosecution? I can see Takashi was, but... I don't know that, Your Honor. I apologize. I don't see that the numbers are lining up, but I'm not sure I know how to read the numbers from the Japanese. Yeah, I just don't know that back then. Sorry about that. Thank you. Ms. Allen. Thank you, and may it please the Court. I'm Catherine Allen on behalf of the PTO. We intervened to address the constitutional issues. As explained in our briefs, we think the challenges are forfeited and the premise is wrong because this case doesn't involve a retroactive application of the law at all. Can I ask you about the forfeit question to begin with? Isn't there a body of law founded in at least one Supreme Court case, was it Johnson v. Robeson or something, that says an agency is not allowed to declare its statute unconstitutional, so what exactly is the point in making the argument to the agency if the agency has to say, sorry, no can do? Yes, Your Honor. There is a series of cases from the 1970s in which the Supreme Court, in addressing particular statutory schemes, said that a party didn't have to raise a constitutional challenge before the agency in order to properly exhaust its claims, and the Court's reasoning was that it would have been futile to do so. In this case, it's not that case, because here, it wouldn't have been futile to raise these arguments before the agency, and moreover, the Supreme Court has recognized in- I'm sorry, so if it wouldn't have been futile, then what would have happened to benefit the patent owner making the argument? Sure, well, Your Honor, if the patent owner had argued- Non-institution? Exactly, Your Honor. Nothing in the statute requires the Board to institute inter-parties review proceedings. If the Board agreed with the argument that applying inter-parties review to a patent that issued prior to the AAA was unconstitutional, then the Board could have declined to institute. And also, I would just point out that the Supreme Court in Thunder Basin and in Elgin versus Department of Treasury has recognized that the general rule you are referring to is not mandatory. And in Elgin, the Court also recognized that there are important systemic reasons to require litigants to raise issues before the agency, because an agency, even if it would be futile, the agency could still apply its expertise to the statute that's at issue and to threshold questions that could aid a court in addressing the constitutional issue later. In addition to our forfeiture arguments, just to turn to the merits, we think that application of inter-parties review to a patent that issued before the AAA was passed is plainly constitutional under this Court's decision in Patlex. Congress had a rational basis for applying inter-parties review to all patents in existence when the AAA was passed to correct agency mistakes and to protect the public interest in keeping patents within their legitimate scope. And moreover, I think the really key point here is that when this patent was issued, it was subject to agency reconsideration in the form of ex parte re-examination. An inter-parties review is simply a different procedure for agency reconsideration. Right, and that's true for IPRs, for patents issued, let's say, at least after 2002, but maybe for almost all patents back to 1981, which I think was the effective date of the ex parte re-exam. That's correct, Your Honor. Right, and one of the reasons I asked the question about Fuji is that I think it doesn't change with respect to this 1999 patent because the ex parte re-exam was broadened in 2002. That would not be true in a different case that is a non-IPR case, a CBM case, right? Sorry, could you rephrase the question? A CBM case, which we don't have here. Yes, Your Honor. Allows reconsideration on grounds that until 2011 were never allowed to be the subject of reconsideration. That's correct, Your Honor. But IPRs, same grounds, same burden of proof. Yes, Your Honor. If there are no further questions. Thank you. One minute. Thank you. I just have a few points to make. First, with respect to the openings on the chip and the wider area limitation, the reason the patent says for the openings being wider at the bottom or larger is it says in column two, lines 31 through 33, the CCD chip can be mounted from the opening having the wider opening area and thereby shutting the through hole tightly. So we're talking about light here getting only on the photosensitive elements of the chip and not others directing light to that area. And as counsel noted, the light will only shine at that narrowest portion of the top hole. So that's what I think we're really talking about here. With respect to the adhesive limitation, we're not trying to impose a negative process limitation on the claims with respect to the adhesive limitation. We're just trying to say that the adhesive itself needs to be an adhesive that's applied on the sides of the chip. That's where the adhesive needs to be located on these claims. So the securing the adhesive needs to happen at that location. The board actually never addressed what the securing part of the limitation meant. It only addressed its thoughts about what an adhesive is. And that's really the key here. How are you securing? Did you ask for a construction of that full limitation focusing on securing? Yes, we asked for the construction of the full limitation securing via adhesive. The board only addressed the plain and ordinary meaning of adhesive. So it's not about the process. The process is informative. But with respect to the apparatus claims, we're really looking at where's the glue on the chip or where is the adhesive placed on the chip. And if it's an injection mold, you can't have the precise positioning of the chip and use the press fit jig to keep the chip in place while you're positioning it from the front. Council noted that the patent applies adhesive using injection. Well, that's true. But the 714 patent injects the adhesive while it's being held in place with a press fit jig. So you're not going to have any movement of the chip caused by the injection of the glue on the sides of the chip. Whereas with a molded injection mold, you will have movement of the chip caused by the mold because the mold is fixed and you're going to inject the adhesive in there and it's going to put pressure on the chip and move things around, as our expert explained. And I don't think it's disputed. I'm jumping to the government's arguments. With respect to forfeiture, she referred to some 1970s cases saying that the board doesn't have authority to address the constitutionality of statutes. But it's actually, there's a 2003 case saying that agencies do not ordinarily have jurisdiction to pass on the constitutionality of federal statutes. That's from the DC circuit, not from the United States Supreme Court, but it's a well established rule. And it would have been futile to raise it below because the board doesn't have discretion to deny an IPR on the basis of a constitutionality issue. The Congress said to the board that it had to apply the IPR statute to all patents. And to operate under that statutory mandate, it had to institute the IPR on a basis under 102 or 103. On the merits of the point, how is it that there is either retroactivity or unconstitutional retroactivity for the internal procedures for reconsideration on the same grounds with the same burden of proof to have been introduced as existed for this patent at the very time it was issued? Well, Congress made it clear that the IPR statute was going to apply retroactively to all patents, no matter when they were issued. So whether or not... Right, but I'm talking about the land graph line about procedure. And I understand that that might in fact not apply if the burden of proof changes because typically burdens of proof are viewed as substantive and not procedural. But no change in the burden of proof for this and no change in the 102, 103 grounds that were available under 301. That's right. There's no change in the burden of proof. The grounds are the same. But land graph did not suggest that concerns about retroactivity have no application to procedural rules. And here, while the grounds may be similar and the burden of proof may be similar, it's not like that Congress just tweaked the procedures for prosecution, which is really what happened when they created inter partes reexamination. They were just tweaking the process of reexamination, ex parte reexamination. They were just tweaking the procedures for examination to allow them to apply to patents after they were issued. Here, we're not in a prosecution stance where we're dealing with an examiner. We don't have opportunities to appeal the board's decision internally. There's no non-final written decision. There's no interviews. There's only a single opportunity to defend your patent. There's only a single opportunity to amend. There's no amendments after final. There's, importantly, no de novo review of the decision by district court like there was with inter partes reexamination. So those are substantive. If those are procedures, but they were procedures that Colavo and the patentee expected to be in place when the patent issued. I believe I might be done with my time. So and then some. Thank you very much. But I expect to see you shortly.